**Opinion issued November 16, 2023**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-21-00658-CV

_____

**ALICE CHOW AND MARK HOLLOWAY, Appellants**

**V.**

**DON MCINTYRE AND TERRY NEHLS, Appellees**

On Appeal from the 269th District Court
Harris County, Texas
Trial Court Case No. 2020-34847

## MEMORANDUM OPINION

This is an appeal from a take-nothing final judgment rendered after a trial.

Alice Chow, Mark Holloway, Don McIntyre, and Terry Nehls are the

members and managers of two companies—AMDT LLC and AMDT II LLC—that

own and operate a business park. They settled an internal business dispute by

executing an agreement under which McIntyre and Nehls had the right to buy out Chow and Holloway at a specified price within 60 days. If McIntyre and Nehls failed to do so, then Chow and Holloway were obligated to buy out McIntyre and Nehls at a specified price. But a buyout never occurred either way.

McIntyre and Nehls then filed this suit, in which they allege that Chow and Holloway breached the settlement agreement by unreasonably refusing to cooperate in settlement and thwarting McIntyre and Nehls's buyout opportunity. Chow and Holloway countersued, alleging that McIntyre and Nehls breached the agreement by refusing to be bought out after failing to timely buy out Chow and Holloway.

The parties tried their breach-of-contract claims to a jury. The jury sided with Chow and Holloway. The jury found that neither Chow nor Holloway breached the settlement agreement, McIntyre and Nehls did breach the settlement agreement, and McIntyre's and Nehls's respective breaches of the agreement were not excused.

The parties did not submit a question on damages to the jury. Instead, based on the jury's findings, Chow and Holloway asked the trial court to enforce the settlement agreement through the equitable remedy of specific performance. In other words, Chow and Holloway requested a judgment compelling McIntyre and Nehls to sell their interests in the companies to Chow and Holloway at the agreed price. McIntyre and Nehls, in turn, opposed specific performance on two grounds. First, they argued that the evidence at trial showed Chow and Holloway had not complied

with the terms of the agreement and thus were not entitled to specific performance. Second, McIntyre and Nehls argued that the evidence showed Chow and Holloway had unclean hands and therefore could not invoke or obtain equitable remedies.

The trial court rendered a judgment that McIntyre and Nehls take nothing on their claim and Chow and Holloway take nothing on their counterclaim. The trial court also denied all requests for attorney's fees and all other relief requested.

Both sides appeal. McIntyre and Nehls contend the jury's findings should be disregarded because the evidence is insufficient to support its findings. On this basis, they ask us to reverse the trial court's take-nothing judgment as to them and remand this case with instructions to the trial court to order specific performance in their favor. Chow and Holloway contend we must uphold the jury's findings because sufficient evidence supports its findings. But Chow and Holloway ask us to reverse the take-nothing judgment as to them and remand this case with instructions to the trial court to order specific performance in their favor and award attorney's fees.

We hold that sufficient evidence supports the jury's findings, which we uphold, and that Chow and Holloway are entitled to specific performance of the settlement agreement. We therefore affirm the take-nothing judgment as to McIntyre and Nehls, reverse the take-nothing judgment as to Chow and Holloway and render judgment that they are entitled to specific performance of the settlement agreement, and remand this case to the trial court for the entry of a final judgment ordering

specific performance in Chow's and Holloway's favor and awarding them attorney's fees as the prevailing parties.

## I.    BACKGROUND

### A.    The AMDT Companies

The parties jointly own two companies, AMDT and AMDT II, both of which derive their names from the first letter of each party's first name (*A*lice, *M*ark, *D*on, and *T*erry). These companies are run as a single business, which involves the ownership and operation of a business park known as Grand Oaks Business Park.

The ownership structure of both companies is identical. In each company, Chow owns 400 shares, Holloway owns 400 shares, McIntyre owns 200 shares, and Nehls owns 200 shares. McIntyre and Nehls handle the day-to-day operations.

Branch Banking & Trust Company, which the parties generally refer to as BB&T, loaned money to one or both of the AMDT companies. The outstanding balance on this BB&T loan at the time of trial was about $7.5 million, which is secured by real estate one or both companies own. In addition, Chow, Holloway, and McIntyre—but not Nehls—made personal guaranties as to the BB&T loan.

### B.    The Settlement Agreement

The parties settled an internal business dispute, which already had resulted in litigation between some of them, via a mediated settlement agreement. At the

mediation's end, Chow, Holloway, McIntyre, and Nehls signed a Rule 11 agreement intended to resolve their disagreements by effecting a so-called business divorce.

Under the Rule 11 agreement, McIntyre and Nehls agreed to buy Chow's and Holloway's interests for $2,150,000 each. McIntyre and Nehls had to tender payment within 60 days of signing a contemplated "Final Settlement Agreement," which the Rule 11 agreement defined as "any further settlement documents, releases and/or judgments" made to effect settlement. If McIntyre and Nehls failed to buy out Chow and Holloway by the deadline, then the latter two had to buy the former pair's interests for a total of $2,150,000.

Regardless of which side ultimately bought out the other one, the Rule 11 agreement provided that anyone bought out "will be removed from the loans of AMDT and AMDT II." The Rule 11 agreement also provided that McIntyre and Nehls would not "incur any additional debt or draw on existing loans" during the 60-day period in which they had the right to buy out Chow and Holloway without the approval of a majority of the companies' managers.

The Rule 11 agreement also had a cooperation clause. It provided that the parties agreed "to cooperate with each other in the drafting and execution of such additional documents as are reasonably requested to implement the terms and spirit of the agreement." Though it was anticipated that the Final Settlement Agreement

would contain additional provisions, including various warranties, the parties agreed to be bound by the Rule 11 agreement.

As contemplated by the Rule 11 agreement, the parties eventually signed a Final Settlement Agreement. The final agreement included all the preceding terms from the Rule 11 agreement, except the cooperation clause. The final agreement specified that in the event of any conflict between the Rule 11 agreement and the final agreement, the Rule 11 agreement was to be controlling as to the conflict. The final agreement also provided for an award of attorney's fees in any suit for breach of the final agreement.

## C. The Unconfirmed Arbitration Award

In the period between the execution of the Rule 11 agreement and the execution of the final settlement agreement, the parties became mired in disagreement about their respective rights under the terms of the Rule 11 agreement. Under the Rule 11 agreement, they were required to arbitrate any such dispute. An arbitration was held, and the arbitrator entered a final award in which he ordered, among other things, that McIntyre and Nehls had to tender cashier's checks to Chow and Holloway in the amount of $2,150,000 apiece. At trial, it was undisputed that no one had sought to confirm the award before trial, but the parties introduced into evidence the arbitrator's award and testimony concerning it before the jury for their evidentiary value as to the parties' contractual expectations. *See generally Zeng v.*

6

*Huang*, No. 01-20-00430-CV, 2022 WL 710206, at \*5 (Tex. App.—Houston [1st Dist.] Mar. 10, 2022, no pet.) (mem. op.) (explaining that action for confirmation of arbitration award is summary proceeding intended to implement arbitrator's award by making award a final, enforceable judgment of trial court). On appeal, no party argues the trial court erred in admitting this arbitration evidence.

### D. McIntyre and Nehls's Buyout Attempt

It is undisputed that McIntyre and Nehls did not buy out Chow's and Holloway's interests in AMDT or AMDT II by the 60-day deadline or afterward. The dispute at trial was whether McIntyre and Nehls simply failed to do so, thereby triggering Chow and Holloway's obligation to buy out McIntyre's and Nehls's interests, or Chow and Holloway breached the settlement agreement by refusing to be bought out by McIntyre and Nehls within the 60-day buyout period.

Nehls testified that the provision of the settlement requiring the removal of bought-out parties from company loans and the 60-day deadline together limited the way in which he and McIntyre could effect a buyout. Given the loan-removal requirement, Nehls said, he and McIntyre either had to keep the BB&T loan and replace Chow and Holloway with other guarantors agreeable to the bank or pay off the BB&T loan in the process of buying out Chow and Holloway. Given the time constraint, paying off the loan was more feasible.

To pay off BB&T, McIntyre and Nehls arranged for a new $10 million loan from Woodforest National Bank. With the Woodforest loan and cash from McIntyre and Nehls, they could both pay off the BB&T loan and pay Chow and Holloway the $4.3 million required for the buyout. McIntyre and Nehls personally guaranteed the new loan, which also was to be secured by the real estate owned by AMDT.

Nehls and McIntyre also arranged for the transaction to close with a title company—specifically, Chicago Title Insurance Company. Nehls testified that a title company was needed because the parties "hadn't been able to work or cooperate." Chicago Title's escrow agent, Nehls explained, was a neutral third party who could shepherd the transaction to completion.

To complete the transaction, Nehls testified, Chow and Holloway had to execute assignments of their interests in AMDT and AMDT II and give them to the escrow agent. Once this was done, the loan would fund, meaning McIntyre and Nehls would direct Woodforest to place the loan funds in escrow with the title company, so that they could retire the BB&T loan and the escrow agent could pay Chow and Holloway for their interests. According to Nehls, under the terms of the Woodforest loan, Chow and Holloway could not execute their assignments after the loan funded, as there could not be a change in the companies' ownership after the loan was made.

According to Nehls, both Woodforest and Chicago Title were aware of the nature of the transaction. Nehls testified that neither Chow nor Holloway ever objected to completing the transaction in this fashion—using assignments and the assistance of a title company—until litigation.

Nehls said he and McIntyre did what was required to finalize the transaction on their end. But Chow and Holloway did not execute their assignments and, Nehls said, the buyout failed for this reason alone. Nehls testified that Woodforest had committed to deliver the new loan funds to Chicago Title but ultimately did not do so because Chow and Holloway had not executed the required assignments. As a result, Chow and Holloway were never paid or bought out.

But Nehls conceded that Woodforest did not require Chow or Holloway to execute assignments as a prerequisite to funding the loan or placing the funds in escrow. Nothing in Woodforest's transaction-related documents mention Chow or Holloway, Woodforest did not require Chow or Holloway to sign anything in order to fund the loan, and Woodforest did not instruct Chicago Title to get assignments from Chow or Holloway. Mike Massey, a transactional lawyer who represented McIntyre and Nehls, drafted the assignments that were presented to Chow and Holloway.

In addition, Nehls conceded that neither the Rule 11 agreement nor the final settlement agreement mention any assignments. Nor do they refer to or require use of a title company, escrow agent, or escrow.

Nehls, however, testified that the completion of transaction-related paperwork followed by funding is customary and ordinary in practice. And the parties' settlement agreement did not forbid the use of a title company either.

Nehls faulted Chow and Holloway for failing to cooperate in completing the transaction. He testified that Chow and Holloway purposefully schemed to keep the transaction from closing to prevent the buyout.

As evidence of this scheme to thwart the buyout, McIntyre and Nehls relied on e-mails exchanged between Chow and Holloway near the expiration of the 60-day deadline. In this exchange, Chow urged Holloway to accept no form of payment other than a cashier's check and insisted they were entitled to payment at the same time they executed any assignments under the terms of the Rule 11 agreement. Chow noted that in three more days, McIntyre and Nehls would lose the right to buy out Chow's and Holloway's interests in AMDT and AMDT II, at which point Chow and Holloway likely would get to buy out McIntyre and Nehls. For his part, Holloway expressed uncertainty as to what types of payment he could legally refuse and how it would look in a future lawsuit if Chow and Holloway did not complete the transaction arranged by McIntyre and Nehls. Holloway noted that McIntyre and

Nehls could sue for violation of the settlement agreement "for messing up their financing arrangements and making it impossible for them to get the deal done."

McIntyre's testimony was far briefer. Among other things, like Nehls, McIntyre faulted Chow and Holloway for failing to cooperate in completing the new loan-buyout transaction by not executing their assignments.

Massey, the lawyer who represented McIntyre and Nehls in the attempted buyout, also testified about the failed new loan-buyout transaction.

Massey acknowledged that there had been an arbitration at which McIntyre and Nehls were ordered to pay Chow and Holloway by cashier's check, and he agreed that McIntyre and Nehls had not done so. However, Massey also noted that the arbitration award had not been confirmed.

As structured, the new loan-buyout transaction did not contemplate payment by cashier's check or immediately upon execution of an assignment. Wire transfer was the means of payment envisioned by the transaction. No one told Massey that payment could only be by cashier's check. Nor did anyone tell him that McIntyre and Nehls had to pay Chow and Holloway at the same time that they executed their assignments.

Massey testified that he drafted the assignments. He said he sent them to Chicago Title's escrow agent with the instruction that they needed to be executed. Massey maintained that if Chow and Holloway had executed the assignments, the

buyout would have occurred because McIntyre and Nehls were ready, able, and willing to tender payment once the assignments were in escrow. As Massey explained the transaction, it was necessary to have the executed assignments in hand when the new loan funded so that McIntyre's and Nehls's representations to Woodforest that they had the authority to enter into a loan on AMDT's behalf would be accurate. Without the assignments, McIntyre's and Nehls's representations to the bank might otherwise constitute fraud. In addition, Massey testified that the Woodforest loan also forbade a transfer of ownership in the companies after the loan was made. In other words, it was the way in which McIntyre and Nehls structured the new loan-buyout transaction—buying out Chow and Holloway in part via a new loan with Woodforest and paying off the old loan with BB&T—that necessitated the assignments be in escrow before the new loan with Woodforest funded and Chow and Holloway were paid. Massey agreed that Woodforest did not require Chow or Holloway to sign anything.

Massey likewise testified that the use of a title company was necessary due to the way in which McIntyre and Nehls structured the buyout. If the buyout had simply involved the transfer of Chow's and Holloway's ownership interests for payment, there would have been no reason to use a title company. The use of a title company was necessary because the transaction involved real estate—specifically, McIntyre

and Nehls were borrowing money from Woodforest and that loan was secured by AMDT-owned real estate.

However, Massey conceded that the final settlement agreement does not specify that the buyout would entail the use of a title company. He also conceded that there is no "specific language" in the final settlement agreement requiring the execution of assignments nor any language specifying that McIntyre and Nehls would tender payment only after the execution of assignments. Indeed, Massey acknowledged that under the final settlement agreement, as written, both sides should likely perform their contractual obligations at the same time, meaning that payments and assignments should be contemporaneously exchanged. He agreed that directing the money to a third party, like a title company, is "probably not" legal tender. Similarly, Massey conceded that no other document required the use of a title company, the execution of an assignment in general, or the execution of an assignment prior to payment in particular.

Massey nonetheless thought that the requested assignments fell within the ambit of the Rule 11 agreement's cooperation clause, which he interpreted as creating an independent obligation to continue cooperating in the drafting and execution of documents even after the execution of the final settlement agreement. He testified that the cooperation clause's reference to "additional documents" included "the documents to complete the purchase" of Chow's and Holloway's

13

interests. That said, Massey agreed that the scope of the cooperation clause is not entirely clear from its text.

Betty Hull, a vice president and senior escrow officer with Chicago Title, was the escrow agent who was to facilitate the new loan-buyout transaction. She testified that if Chow and Holloway had executed their assignments, the Woodforest loan would have funded, and they would have been paid. The buyout did not occur because they did not execute the assignments.

Hull received the assignments from Massey, so that Hull could obtain Chow's and Holloway's signatures. Hull testified that she spoke to Chow on the phone. According to Hull, Chow did not refuse to execute an assignment. In addition, Hull testified that no one ever told her that a cashier's check would be the only acceptable form of payment. At several points in her testimony, Hull conceded that Chow said during their conversation that she would execute the assignment if paid. But Hull also stated that neither Chow nor Holloway insisted on being paid at the same time they executed the assignments. Hull's testimony was, in essence, that neither Chow nor Holloway ever objected to executing the assignments on the terms outlined by Hull; instead, they simply stopped communicating with Hull about the buyout.

At trial, the parties disputed how much delay there would have been between Chow's and Holloway's execution of the assignments and payment. Hull did not dispute that Chow and Holloway would not have been paid at the very moment that

they executed their assignments. Hull testified that payment would customarily occur the same day or the following day, depending on what time of day the assignments were executed. The only circumstance under which it could take several days for a loan to fund, Hull explained, is when a transaction closes on a Friday afternoon, in which case funding would not take place until the following Monday. But Hull agreed that she was unable to tell Chow in their conversation exactly when payment would occur. And while not customary, Hull conceded the possibility that two or three days could have elapsed before payment occurred.

Hull also conceded that Woodforest sent her a detailed set of instructions as to what was required to complete the transaction and that the execution of assignments was not included among the requirements stated in the bank's detailed instructions. In fact, Woodforest did not require Chow or Holloway to sign or execute anything. No one affiliated with Woodforest, including its lawyer, contacted Hull to request that Chow or Holloway sign documents. On the contrary, Hull agreed it was Massey who instructed her to obtain the assignments before the loan funded.

Jude McNamara, a relationship manager and senior vice president in Woodforest's commercial real estate department testified by transcribed deposition. He testified that the loan did not fund because "we didn't have all the information we needed," clarifying that the information in question was "whatever document it was [Chow and Holloway] needed to sign, according to the title company and

15

borrower." But McNamara agreed that the closing instructions distributed by Woodforest's lawyer did not identify any documents that Chow or Holloway had to execute before the loan could fund. McNamara further agreed that Woodforest did not fund the loan because it did not receive approval to do so from the title company and borrower.

Chow testified that under the parties' settlement—and their Rule 11 agreement in particular—she and Holloway were entitled to be paid for their ownership interests at the same time that they executed their assignments. In her view, the Rule 11 agreement's use of the word "tender" meant that payment had "to be at the same time" as the transfer of her ownership interest, as memorialized by the assignment of that interest. Consistent with this understanding of the settlement, Chow repeatedly testified that she was ready and willing to execute an assignment, provided that she got paid for her ownership interest when she executed the assignment.

Hull, however, told Chow that payment would not be contemporaneous. According to Chow, Hull represented that Woodforest stood ready to fund the loan necessary to buy out Chow's and Holloway's interests once Chow and Holloway executed their assignments. At trial, Chow objected that being in a "position to fund is not the same as funded." In a telephone call between Hull and Chow, Chow asked Hull if she had the money to pay her in hand, and Hull told her that she did not have

the money at present. Chow testified that Hull said it would take some time to get the money needed to pay Chow and Holloway. Chow's testimony as to how long Hull said it would take was somewhat inconsistent. Chow repeatedly stated that Hull said it would take two to three days after the execution of the assignments. But Chow also conceded it was possible that Hull had said payment would occur on the same day as or on the day after Chow and Holloway executed their assignments. In any event, Chow testified that she told Hull she was entitled to be paid at the same time that she executed the assignment, and that she would execute the assignment if she was paid at the same time. Chow said she never heard from Hull again after stating this position.

Chow conceded that the words "at the same time" do not appear in the Rule 11 agreement, but she noted it does not mention an assignment either. Chow feared that if she executed an assignment without having payment in hand, she might not be paid. During her testimony, she noted the relationship between the parties was contentious, involving prior litigation, mediation, and arbitration. In addition, Chow noted that Holloway had assigned his interest in another, unrelated company—Domala—to McIntyre in 2015 but never received the promised payment. Chow's only recourse if she was not paid would have been to sue, but she took no comfort in the possibility of litigation because one can always lose a lawsuit.

On the stand, Chow acknowledged that her preference was to buy out McIntyre and Nehls, rather than be bought out by them, and she said this had been her preferred outcome all along. But Chow insisted she would have abided by the Rule 11 agreement if McIntyre and Nehls had tendered payment for her interest within the 60-day deadline. When asked if she would have executed the assignment had she received the money she was due, Chow replied: "Of course." Chow explained: "That's what the agreement says, and I have to do it." Despite her preference to buy out McIntyre and Nehls, Chow maintained that she was neither happy nor unhappy with the Rule 11 agreement. The agreement was necessary to resolve the parties' dispute with respect to the companies.

As to her e-mail correspondence in which she told Holloway not to accept any form of payment other than a cashier's check, Chow testified that she wanted to be paid and the final award in the arbitration specified this form of payment. Chow denied that her e-mails evidenced an intent to run out the clock on the 60-day deadline by which McIntyre and Nehls had to tender payment. She maintained that she fulfilled her contractual obligation to cooperate.

Holloway testified that he wanted the buyout to close. And he intended to finalize the transaction until he learned that Hull did not have the money to pay him for his interest at the same time he executed the assignment.

18

Holloway testified that Hull informed him that she had the money to pay him. Based on her representation, Holloway expected the buyout to close. However, Holloway testified, he eventually learned that Hull "never had the money." Hull had told Chow that she did not have the money in escrow to pay them. Through Chow, Holloway learned that Hull said the funds needed to pay them would be available two or three days after Chow and Holloway executed the assignments. Holloway found this unacceptable, stating with respect to the availability of the funds needed to pay him that "[w]ould be and is are two different things." Though Holloway did not explain this to Hull, he knew Chow had done so.

Holloway acknowledged that if he were buying out McIntyre and Nehls, he would want them to execute assignments. Nevertheless, the Rule 11 agreement said nothing about assignments. Holloway testified that if McIntyre and Nehls wanted him to execute an assignment, he wanted payment "at the time of the assignment." He said he would have executed the assignment if he had been paid first or at the same time.

Holloway explained his insistence on contemporaneous payment by reference to the prior Domala transaction. In 2015, he assigned his interest in that company to McIntyre's son but never received the promised payment. He stated that he "didn't want that to happen again" and was "not going to be victimized twice" by them. Given this experience, Holloway said there was "no guarantee" he would have

19

received his money if he had assigned his interest first. Though Hull represented that he would be paid afterward, Holloway did not know whether Hull's representation was "true or not."

Regarding Chow's e-mail instructing him to accept no form of payment other than a cashier's check, Holloway testified that Chow knew about the prior Domala transaction, and he said she was looking out for his best interest. Holloway acknowledged the portion of Chow's e-mail in which she stated that McIntyre and Nehls would lose their chance to buy them out in three days, but Holloway testified that he and Chow discussed the buyout and agreed that they had to accept a timely tender of payment if it was made. Holloway never had the impression that Chow would refuse to assign her interest to McIntyre and Nehls if they paid her. But any speculation of this sort was moot, as Hull never had the funds needed to pay Chow and Holloway.

Holloway acknowledged the cooperation clause in the Rule 11 agreement. He understood this provision to require the parties to work together to get the final settlement agreement completed. But Holloway did not understand the cooperation clause as entailing any other agreements.

### E. Chow and Holloway's Buyout Attempt

It is undisputed that Chow and Holloway tried to buy out McIntyre's and Nehls's interests in AMDT and AMDT II after McIntyre and Nehls's buyout attempt

failed. The dispute at trial was whether Chow and Holloway had the right or obligation to do so, given their alleged breach of the settlement agreement by refusing to cooperate. In addition, it was disputed whether Chow and Holloway fulfilled the contractual requisites for buying the interests of McIntyre and Nehls.

Chow testified that she and Holloway tried to give cashier's checks to McIntyre and Nehls after the 60-day deadline expired.

First, Chow and Holloway went to Nehls's home, where he met them at the gate. Nehls was "very angry." According to Chow, Nehls was so angry that she and Holloway remained two or three car lengths distant. Chow told Nehls that she and Holloway had a cashier's check. Chow testified that Nehls refused to accept the cashier's check.

Then Chow and Holloway went to McIntyre's office, where he met them in the parking lot. Chow told him that she and Holloway had a cashier's check. She said McIntyre was "enraged" by their tender.

Holloway gave similar testimony. He stated that when he and Chow arrived at Nehls's home to tender payment, Nehls became "very upset." Holloway said Nehls told them that he was "going to ruin" them. Holloway and Chow tried to explain to Nehls that they were just trying to tender payment to buy out his interest, and Nehls refused to accept payment.

Afterward, Holloway testified, he and Chow drove to McIntyre's office. Chow approached McIntyre and told him that they were there to buy him out, and McIntyre became "very irate," so much so that Chow got back into the car. "McIntyre came to the window of the car with both fists in the air," and he told Holloway, "[Y]ou and me, come to my office right now, we'll settle this." That did not happen, and McIntyre told them to leave.

Nehls agreed that Chow and Holloway met him at his gate. But he said he did not know whether they had a cashier's check. When asked what they said to him, Nehls initially replied, "I really don't recall. I was in no mood to be speaking with them." He then acknowledged that they "may have said they were coming to try to buy me out." But Nehls said he "was having none of it" and "asked them to leave," which they did.

McIntyre agreed that Chow and Holloway met him at his office—or rather in the parking lot of the Grand Oaks Business Park—and that they told him they were there to buy out his interest. McIntyre replied, "Please leave." At trial, McIntyre said he would not have accepted payment even if they had the money. McIntyre further testified that he would not have accepted payment if they had both the money and a release from the BB&T loan.

As previously noted, in addition to the buyout provisions, the Rule 11 settlement agreement also provides: "Any member who is bought out under this

Agreement will be removed from the loans of AMDT and AMDT II." The final settlement agreement likewise includes this removal provision.

Under the buyout attempted by McIntyre and Nehls, the existing loan with BB&T would have been paid off. Hence, Chow and Holloway would not have needed to be removed from this loan as guarantors, as the loan would no longer exist. At trial, one of the disputed issues was whether Chow and Holloway failed to satisfy the loan-removal provision when they tried to buy out McIntyre and Nehls.

It is undisputed that Chow and Holloway had not removed McIntyre or Nehls from the BB&T loan when they tried to tender payment to McIntyre and Nehls. With respect to the latter, this is immaterial because it is undisputed that Nehls did not personally guarantee the BB&T loan. McIntyre, however, did guarantee the loan.

At trial, Chow testified she was unable to comply with the loan-removal provision because she did not have access to the BB&T account. According to her, McIntyre and Nehls had control of the companies and the account. BB&T refused to speak with Chow and Holloway about the loan because they were not the account holders.

## F.    Jury Verdict

The verdict form posed eight questions to the jury. The first two questions asked whether Chow and Holloway failed to comply with the applicable agreements, which were identified as the Rule 11 agreement and final settlement agreement. The

23

jury answered "no" with respect to both Chow and Holloway. The third and fourth questions asked if McIntyre and Nehls failed to comply with these same agreements. In both cases, the jury answered "yes." In the event the jury had answered all of the preceding four questions in the affirmative, the fifth question asked which side breached the agreements first, Chow and Holloway or McIntyre and Nehls. Because the jury found that Chow and Holloway did not breach the agreements, it did not answer this contingent question. The sixth question asked whether McIntyre and Nehls were ready, willing, and able to tender performance under the two agreements from the date on which they had secured the Woodforest loan commitment to fund the transaction to the present. The jury answered this question "no." Finally, the seventh and eighth questions asked whether McIntyre's and Nehls's failure to comply with the agreements was excused. The jury answered "no" as to both.

### G. Motion for Judgment Notwithstanding the Verdict

McIntyre and Nehls moved for judgment notwithstanding the verdict, arguing that: (1) they were entitled to judgment as a matter of law because undisputed and conclusive evidence proved their claim for breach of contract; and (2) they were entitled to a judgment denying Chow and Holloway specific performance on their counterclaim and denying Chow and Holloway attorney's fees because they failed to prove they tendered performance and had unclean hands, which disentitles them to any equitable remedies. As the basis for the unclean-hands claim, McIntyre and

24

Nehls argued that Chow and Holloway had conspired to thwart the contractual right to buy out Chow and Holloway. The trial court denied the motion for judgment notwithstanding the verdict.

### H.    Motions for Entry of Judgment on the Verdict

Chow and Holloway each moved for the entry of judgment on the verdict, requesting entry of a take-nothing judgment against McIntyre and Nehls on their contract claim and a judgment in favor of Chow and Holloway on their contract counterclaim ordering specific performance and awarding attorney's fees. The trial court did not expressly rule on Chow's and Holloway's respective motions.

### I.    Trial Court's Judgment

The trial court entered a take-nothing judgment on both McIntyre and Nehls's contract claim and on Chow and Holloway's counterclaim. The trial court's judgment does not specify a rationale as to why it denied Chow and Holloway specific performance, or any relief, even though the jury verdict was in their favor. The trial court also denied attorney's fees as to all parties, ordering all parties to bear their own attorney's fees and costs.

## II.    DISCUSSION

Both sides appeal from the trial court's judgment. McIntyre and Nehls argue the evidence is factually insufficient to support the jury's findings. They maintain the great weight and preponderance of the evidence shows that Chow and Holloway

25

breached the Rule 11 agreement and final settlement agreement by refusing to execute the assignments and that but for Chow's and Holloway's breach McIntyre and Nehls were ready, able, and willing to perform their contractual obligations. Chow and Holloway, in turn, argue the evidence supports the jury's findings and that the trial court erred in refusing to order specific performance in their favor. That is, they maintain the trial court should have ordered McIntyre and Nehls to sell their interests to Chow and Holloway at the agreed price, given McIntyre and Nehls's failure to buy them out by the 60-day deadline for doing so. Chow and Holloway also argue the trial court erred in failing to award them their attorney's fees.

## A.    Factual Sufficiency

When parties challenge the factual sufficiency of the evidence on an issue for which they bore the burden of proof, they must show the adverse finding is against the great weight and preponderance of the evidence. *Altice v. Hernandez*, 668 S.W.3d 399, 410 (Tex. App.—Houston [1st Dist.] 2022, no pet.). In contrast, when parties challenge the factual sufficiency of the evidence on an issue for which they did not bear the burden of proof, they must show the evidence supporting the adverse finding is so weak as to make the verdict clearly wrong and manifestly unjust. *Gabel v. Gabel-Koehne*, 649 S.W.3d 590, 599 (Tex. App.—Houston [1st Dist.] 2022, no pet.). In both types of factual-sufficiency review, we consider and weigh all the evidence. *Altice*, 668 S.W.3d at 410; *Gabel*, 649 S.W.3d at 599. But the jury alone

26

weighs the credibility of the witnesses and may choose to believe one witness and not another. *Patriotic Contracting v. Shelter Prods.*, 650 S.W.3d 627, 649 (Tex. App.—Houston [1st Dist.] 2021, pet. denied); *Hunter v. Tex. Farm. Bureau Mut. Ins. Co.*, 639 S.W.3d 251, 260 (Tex. App.—Houston [1st Dist.] 2021, no pet.).

1. **Chow and Holloway's Compliance with the Settlement Agreement and McIntyre and Nehls's Readiness, Willingness, and Ability to Tender Performance under the Agreement (Questions 1, 2, and 6)**

McIntyre and Nehls sued Chow and Holloway for breach of the settlement agreement. In response to the first and second questions posed to the jury, the jury found that Chow and Holloway did not fail to comply with the Rule 11 agreement and final settlement agreement. In response to the sixth question posed to the jury, the jury found that McIntyre and Nehls were not ready, willing, and able to tender performance under these agreements. At trial, McIntyre and Nehls bore the burden of proof on these issues. *See, e.g.*, *SLT Dealer Grp. v. AmeriCredit Fin. Servs.*, 336 S.W.3d 822, 828 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (parties asserting breach of contract must prove essential elements of claim, including that they performed or tendered performance required of them under contract); *Olson v. Bayland Publ'g*, 781 S.W.2d 659, 664 (Tex. App.—Houston [1st Dist.] 1989, writ denied) (purchasers need not tender performance under contract but must prove they were ready, willing, and able to perform to recover on contract claim). On appeal McIntyre and Nehls argue that the jury's findings as to their own readiness,

willingness, and ability to tender performance under the settlement agreement and Chow and Holloway's compliance with the agreement are against the great weight and preponderance of the evidence. We disagree with McIntyre and Nehls.

At trial, the issue before the jury was whether Chow and Holloway breached the Rule 11 agreement and final settlement agreement by not executing their assignments before McIntyre and Nehls tendered payment. McIntyre and Nehls placed particular emphasis upon the Rule 11 agreement's cooperation clause, under which all the parties contractually committed themselves "to cooperate with each other in the drafting and execution of such additional documents as are reasonably requested to implement the terms and spirit of the agreement." This clause, which limits itself to the execution of "reasonably requested" documents that are intended to implement not just the letter but also the "spirt of the agreement," presented an issue for determination by the fact finder, and the factfinder in this case, the jury, heard ample evidence from which it could have reasonably found, as it did, that Chow and Holloway did not breach the settlement agreement by refusing to execute the assignments before they received payment for their interests.

While the jury heard evidence on both sides of this issue, the quantity and quality of evidence supporting the jury's findings that neither Chow nor Holloway breached the settlement agreement precludes us from concluding that the great

28

weight and preponderance of the evidence is to the contrary. Without recapitulating

the entirety of the background already recited above, the jury heard evidence that:

- neither the Rule 11 agreement nor the final settlement agreement refer to the execution of assignments, let alone require execution before payment;

- to the extent the assignments can be characterized as necessary, it was McIntyre and Nehls's method of financing the buyout that made them so;

- Massey, an attorney who represented McIntyre and Nehls, drafted the assignments and gave them to Hull, the escrow agent, for execution;

- McIntyre and Nehls, not Woodforest National Bank, insisted Chow and Holloway execute the assignments before payment would be tendered;

- Hull did not have the money to pay Chow and Holloway at any point, and she could not say with certainty when exactly they would be paid; and

- Woodforest, per its representative, McNamara, did not fund the buyout because it did not receive approval from Hull and the borrower.

In addition, Massey made a key concession with respect to the Rule 11

agreement's cooperation clause, agreeing that the scope of the clause is not

altogether clear. The jury could have reasonably factored in the clause's lack of

clarity in deciding that Chow and Holloway did not breach the clause.

On appeal, as below, McIntyre and Nehls place great emphasis on an e-mail

chain between Chow and Holloway that McIntyre and Nehls characterize as a

smoking gun showing that Chow and Holloway intended to thwart the buyout. But

the e-mail chain in question is susceptible to more than one reasonable interpretation.

In this e-mail chain, Chow advised Holloway to accept only a cashier's check.

Consistent with McIntyre and Nehls's position that Chow and Holloway intended to

derail the buyout, Hull testified that Chow and Holloway did not convey this demand for payment by cashier's check to her and instead simply stopped communicating. Chow also wrote that only three more days remained before McIntyre and Nehls would lose their opportunity to buy out Chow and Holloway. McIntyre and Nehls argue that this sentiment evidences an intent to ensure their opportunity was lost.

However, in this same e-mail chain, Chow contradicts Hull's testimony by writing to Holloway that Hull "knows you want [a] cashier['s] check." Faced with this conflict in the evidence, the jury could have reasonably credited Chow's contemporaneous written statement over Hull's trial testimony. Nor was the jury required to construe Chow's obvious enthusiasm for the possibility that McIntyre and Nehls might lose their opportunity to buy out Chow and Holloway as a plan to ensure the chance was lost.

At trial, Chow testified that her preference was to buy out McIntyre and Nehls, rather than be bought out by them. But she also acknowledged that the settlement agreement gave McIntyre and Nehls the right to buy her and Holloway out first, so long as they did so within 60 days of the execution of the final settlement agreement, and she testified that she would have accepted a buyout if she was paid at the same time she executed the assignment of her ownership interest in the companies. As the lone judge of witness credibility, the jury was entitled to credit Chow's testimony.

The jury also heard evidence that payment by cashier's check was ordered in an arbitration that took place after the execution of the Rule 11 agreement but before the execution of the final settlement agreement. While no one sought to confirm the final arbitration award before trial and the award was thus unenforceable, the jury could have reasonably inferred from the award that a demand for payment by cashier's check would not have operated as a surprise to McIntyre or Nehls and did not constitute a last-minute stratagem to frustrate or obstruct their buyout rights.

In this e-mail chain, Holloway asks some questions regarding his rights, including what form of payment he can legally refuse. Holloway also expresses concern as to how refusing payment might look should litigation ensue. As with Chow's statements, McIntyre and Nehls maintain that Holloway's statements evince a desire and plan to prevent them from buying Chow's and Holloway's interests.

The jury was free to embrace McIntyre and Nehls's view of Holloway's statements in the e-mail chain, but the jury did not do so. Nor was the jury required to embrace McIntyre and Nehls's point of view. Holloway's question about what form of payment he could legally refuse and his expression of concern about the possibility of future litigation are both just as consistent with a desire to fulfill his contractual obligations while protecting his own contractual rights as they are with an ostensible scheme to prevent McIntyre and Nehls from buying him out.

In addition, the e-mail chain in question supplies a contemporaneous explanation as to why Holloway might be focused on the protection of his rights. Chow refers to the prior incident in which Holloway executed an assignment of his ownership interest in another company—Domala—before receiving payment from McIntyre or his son and then never received the money he was owed for his interest. Holloway testified about this prior incident at trial, explaining that he wanted to ensure this same scenario did not unfold a second time. Based on this evidence, the jury could have reasonably found that Holloway's statements in the e-mail reflect a desire to comply with the settlement agreement while also protecting his own rights.

McIntyre and Nehls counter that the evidence conclusively shows they were ready, willing, and able to tender performance—to tender the payments required by the buyout—under the Rule 11 agreement and final settlement agreement, so that Chow and Holloway had no choice but to execute the assignments. We disagree.

As discussed in the background section, McIntyre and Nehls put on evidence that they were ready, willing, and able to pay Chow and Holloway the sums required to buy them out and that the buyout failed only because Chow and Holloway unreasonably refused to execute assignments before being paid. But the jury also heard contrary testimony from one of McIntyre and Nehls's very own witnesses.

The Rule 11 agreement required McIntyre and Nehls to tender payment within 60 days of the execution of the final settlement agreement, and the final settlement

agreement repeated this requirement. Massey, the transactional lawyer who represented McIntyre and Nehls in their attempted buyout of Chow and Holloway, testified without objection that both sides likely were obligated to perform their obligations simultaneously under this term of the settlement agreement. In other words, McIntyre and Nehls likely had a contractual duty to pay Chow and Holloway at the same time the assignments were executed, just as Chow and Holloway maintained. Based on Massey's testimony, which the jury may have found especially persuasive coming as it did from one of McIntyre and Nehls's own lawyers, the jury could have reasonably found that McIntyre and Nehls were not ready, willing, and able to tender the performance the settlement agreement actually required of them. That is, the jury was entitled to find that the performance McIntyre and Nehls were ready, willing, and able to perform—payment after the execution of assignments— did not fulfill the contractual obligations imposed by the settlement agreement.

As Massey's testimony signals, both sides treated the settlement agreement as being ambiguous in certain respects throughout trial and elicited testimony from witnesses about their understanding of the parties' obligations under the agreement. Under these circumstances, it was the jury's prerogative to resolve any ambiguity. *See, e.g.*, *Title Res. Guar. Co. v. Lighthouse Church & Ministries*, 589 S.W.3d 226, 232 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (stating that interpretation of ambiguous contract presents question of fact for factfinder). And, in view of all the

evidence the jury heard about the performance McIntyre and Nehls were required to tender under the settlement agreement, the jury's finding that they were not ready, willing, and able to tender performance is not against the great weight and preponderance of the evidence. Likewise, in view of all the evidence the jury heard about the settlement agreement and the parties' conduct, the jury's findings that Chow and Holloway complied with the Rule 11 agreement and final settlement agreement is not against the great weight and preponderance of the evidence. Thus, the evidence is factually sufficient to support the jury's findings on these issues.

**2.  McIntyre and Nehls's Compliance with the Settlement Agreement and Whether Any Noncompliance on Their Part Was Excused by Chow and Holloway's Conduct (Questions 3, 4, 7, and 8)**

Chow and Holloway counterclaimed for breach of the settlement agreement. In response to the third and fourth questions posed to the jury, the jury found that McIntyre and Nehls failed to comply with the Rule 11 agreement and final settlement agreement. At trial, Chow and Holloway bore the burden of proof on this issue. *See, e.g.*, *SLT Dealer Grp.*, 336 S.W.3d at 828 (parties asserting breach of contract must prove essential elements of claim). On appeal, McIntyre and Nehls argue that the evidence supporting the jury's findings as to their noncompliance with the settlement agreement is so weak that it makes the verdict clearly wrong and manifestly unjust.

In the event the jury found, as it did, that McIntyre and Nehls failed to comply with the Rule 11 agreement and final settlement agreement, McIntyre and Nehls

34

claimed any noncompliance on their part was excused by the conduct of Chow and Holloway. In response to the seventh and eighth questions posed to the jury, the jury found McIntyre's and Nehls's noncompliance with the settlement agreement was not excused. At trial, McIntyre and Nehls bore the burden of proof on the issue of excuse. *See, e.g.*, *Henry v. Masson*, 333 S.W.3d 825, 834 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (parties claiming their contractual performance was excused by another's material breach are interposing affirmative defense, on which they bear burden of proof). On appeal, McIntyre and Nehls argue the jury's findings on the issue of excuse are against the great weight and preponderance of the evidence.

We disagree with both of McIntyre and Nehls's positions. The evidence is factually sufficient to support the jury's findings that McIntyre and Nehls failed to comply with the settlement agreement and their noncompliance was not excused.

At trial, the issue with respect to McIntyre's and Nehls's compliance with the settlement agreement was whether they breached the Rule 11 agreement and final settlement agreement by refusing to accept Chow and Holloway's attempt to tender payment to buy them out after their own buyout opportunity had expired. The evidence on this issue is essentially one-sided in favor of Chow and Holloway, both of whom testified that they tried to tender payment to McIntyre and Nehls but both men refused to discuss the matter or receive payment. Nehls himself confirmed that he "was having none of it" and asked Chow and Holloway to leave. McIntyre

likewise testified that he asked Chow and Holloway to leave and acknowledged that he would not have accepted payment from them even if they had the money. In view of all the evidence, the evidence is not so weak as to make the jury's findings that McIntyre and Nehls failed to comply with the settlement agreement clearly wrong and manifestly unjust. *See, e.g.*, *SLT Dealer Grp.*, 336 S.W.3d at 828 (essential elements of contract claim that claimants must prove generally are existence of valid contract, performance or tendered performance by claimants, breach of contract by parties against whom claim is asserted, and damages resulting from breach).

McIntyre and Nehls counter that Chow and Holloway did not genuinely tender the performance required of them merely by trying to pay McIntyre and Nehls for their ownership interests. In support of this argument, McIntyre and Nehls rely on the provision in the Rule 11 agreement and the corresponding provision in the final settlement agreement that provided anyone bought out "will be removed" from the companies' loans. McIntyre and Nehls maintain that Chow and Holloway had not removed McIntyre and Nehls from the companies' loans when they tried to buy out McIntyre and Nehls. For this reason, McIntyre and Nehls argue, the evidence is factually insufficient to support the finding that they failed to comply with the settlement agreement by refusing to accept Chow and Holloway's tender.

But the jury questions regarding both Chow and Holloway's compliance and McIntyre and Nehls's compliance with the settlement agreement—the first, second,

third, and fourth questions posed to the jury—instructed that any "failure to comply must be material" and then listed multiple circumstances "to consider in determining whether a failure to comply is material," including "the extent to which the injured party will be deprived of the benefit which they reasonably expected." Given this instruction and the evidence the jury heard concerning the companies' loans, the jury could have reasonably found that the loan-removal issue was immaterial as to Chow and Holloway's compliance with the settlement agreement. *See, e.g.*, *Hrdy v. Second Street Props.*, 649 S.W.3d 522, 544 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) (materiality is fact-dependent and therefore presents question of fact for factfinder to decide absent applicable legal rule to contrary).

Absent a contrary provision in the company agreement, a member of a limited liability company is not liable for a company debt, obligation, or liability. TEX. BUS. ORGS. CODE § 101.114. The company agreements for AMDT and AMDT II, both of which are limited liability companies, were admitted in evidence at trial. Neither one of these company agreements includes a provision that purports to make members liable for company debts, obligations, or liabilities. Therefore, Nehls and McIntyre are liable on company loans solely to the extent that they personally guaranteed these loans. *See, e.g.*, *Julka v. U.S. Bank Nat'l Ass'n*, 516 S.W.3d 84, 88 (Tex. App.— Houston [1st Dist.] 2017, no pet.) (indicating that Texas law, like law of other

jurisdictions, protects member of limited liability company from liability on note except to extent member personally guaranteed payment).

The sole loan concerning AMDT and AMDT II discussed at trial was the one for the approximately $7.5 million dollars one or both companies borrowed from BB&T. It is undisputed that Nehls did not personally guarantee this loan. Nehls himself testified to this fact. Therefore, there was no loan from which Nehls had to be removed, and the jury could have reasonably found that the settlement agreement's loan-removal provision was immaterial as to Nehls.

McIntyre, in contrast, did personally guarantee the BB&T loan. But he testified he would not have accepted Chow and Holloway's payment even if they had simultaneously tendered both payment and a release from the BB&T loan. In other words, McIntyre did not contend that he would have accepted Chow and Holloway's payment if only it had been accompanied by a release from the loan; on the contrary, McIntyre disavowed that the release would have made a difference in his decision-making. Under these circumstances, the jury could have reasonably found that Chow and Holloway's failure to remove or release McIntyre from the BB&T loan at the same time they tendered payment to him was immaterial. *See, e.g.*, *Hrdy*, 649 S.W.3d at 544 (jury could have reasonably found that anything partner said or did not say about possibility of compensation for surrender of partnership's option to buy parcel was immaterial, given that other partners had

abandoned all claims for damages at trial and did not claim they would have demanded monetary compensation if they had only known of option's value).

Moreover, the jury questions on the parties' compliance with the settlement agreement also instructed the jury to consider "the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing" in deciding whether a failure was material. At trial, Chow testified without contradiction that McIntyre and Nehls had control of the companies and the bank account, and that BB&T refused to speak with her and Holloway because they were not the account holders. Thus, to the extent that Chow and Holloway were required to remove McIntyre from the BB&T loan at the same time they tendered payment (a proposition that is not obvious from the face of the Rule 11 agreement, which merely states that a "member who is bought out under this Agreement will be removed from the loans of AMDT and AMDT II" without specifying a particular deadline for doing so), the jury may have reasonably found that their failure to do so was blameless and thus not a material failure to comply with the settlement agreement.

At trial, McIntyre and Nehls also posited that any noncompliance on their part was excused by the conduct of Chow and Holloway, who had materially breached or repudiated the settlement agreement first. On appeal, McIntyre and Nehls rely on the same conduct, and the same evidence concerning this conduct, which they argue establishes that Chow and Holloway did not comply with the settlement agreement:

39

Chow's and Holloway's refusal to execute assignments before being paid and their purported intent to thwart a buyout by McIntyre and Nehls, as evidenced in e-mails.

In view of all the evidence, we hold the jury's findings rejecting McIntyre's and Nehls's claims of excuse are not against the great weight and preponderance of the evidence for the same reasons we have already discussed in affirming the jury's findings that Chow and Holloway complied with the settlement agreement and McIntyre and Nehls were not ready, willing, and able to tender the performance required by the settlement agreement. Thus, the evidence is factually sufficient.

## B. Specific Performance

In the preceding part of the opinion, we rejected all of McIntyre and Nehls's factual-sufficiency challenges. Accordingly, we must affirm the jury's verdict.

Chow and Holloway argue the trial court erred in refusing to order specific performance of the settlement agreement, given the jury verdict in their favor. That is, they contend the trial court erred in declining to order McIntyre and Nehls to sell their interests in the companies to them. We agree with Chow and Holloway.

Specific performance is an equitable remedy that may be awarded in lieu of damages upon a showing of breach of contract. *Maxey v. Maxey*, 617 S.W.3d 207, 225 (Tex. App.—Houston [1st Dist.] 2020, no pet.). To be entitled to specific performance, the parties seeking this remedy must show that they have substantially performed their part of the contract, they are able to continue performing their part

of the contract, and the parties who will be ordered to perform have breached the contract. *Id.* at 225–26. Thus, parties who have materially breached the contract are not entitled to specific performance. *Capcor at KirbyMain v. Moody Nat'l Kirby Houston S*, 509 S.W.3d 379, 390–91 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

We review a trial court's order granting or denying an equitable remedy for an abuse of discretion. *Davis v. Sheerin*, 754 S.W.2d 375, 383 (Tex. App.—Houston [1st Dist.] 1988, writ denied). This includes an order concerning specific performance. *See, e.g.*, *Pickard v. LJH Enters.*, No. 01-07-01105-CV, 2010 WL 1493105, at *2 (Tex. App.—Houston [1st Dist.] Apr. 15, 2010, no pet.) (mem. op.) (specific performance lies in discretion of trial court, which abuses discretion when it acts arbitrarily, unreasonably, or without reference to guiding rules or principles).

The trial court made no express findings on the issue of specific performance. In the trial court, McIntyre and Nehls argued that Chow and Holloway were not entitled to specific performance on two grounds. First, McIntyre and Nehls argued that Chow and Holloway's silent scheme to prevent themselves from being bought out under the settlement agreement shows they had unclean hands, which disentitles them to an equitable remedy like specific performance. Second, McIntyre and Nehls argued that Chow and Holloway were disentitled to specific performance because they did not tender the performance required under the settlement agreement when

41

they tendered payment without also removing McIntyre and Nehls from the companies' loans. McIntyre and Nehls reprise these two arguments on appeal.

### 1. Unclean Hands

It is a legal maxim that those who seek equity must also do equity. The doctrine of unclean hands embodies this maxim by allowing a court to refuse an equitable remedy to parties whose own conduct in the same matter or transaction has been inequitable. *Stewart Beach Condo. Homeowners Ass'n v. Gili N Prop Invs.*, 481 S.W.3d 336, 351 (Tex. App.—Houston [1st Dist.] 2015, no pet.). But the doctrine of unclean hands does not restrict equitable remedies to those whose conduct is beyond question or reproach. *See, e.g.*, *Norris of Houston v. Gafas*, 562 S.W.2d 894, 897 (Tex. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.) (doctrine of unclean hands "does not operate to repel all sinners"). Therefore, to invoke the doctrine of unclean hands, parties must show they have been seriously harmed and the wrong cannot be corrected without applying the doctrine. *Stewart Beach Condo.*, 481 S.W.3d at 351; *see also In re Nolle*, 265 S.W.3d 487, 494 (Tex. App.—Houston [1st Dist.] 2008, orig. proceeding) (unclean hands is affirmative defense).

The jury was not asked to find whether Chow and Holloway's conduct was inequitable, which is a fact question. *See, e.g.*, *Grant v. Laughlin Env't*, No. 01-07-00227-CV, 2009 WL 793638, at *11 (Tex. App.—Houston [1st Dist.] Mar. 26, 2009, pet. denied) (mem. op.) (while court ultimately decides if equitable remedy is

appropriate, jury decides fact issues, including whether conduct is inequitable). But McIntyre and Nehls put Chow and Holloway's e-mails before the jury and posited that they revealed a conscious plan to thwart McIntyre and Nehls's buyout rights under the settlement agreement. The jury implicitly rejected this position by finding that Chow and Holloway had complied with the settlement agreement.

Thus, reduced to its essence, McIntyre and Nehls's position is that the trial court could deny specific performance to Chow and Holloway because they breached the settlement agreement, even though the jury found otherwise. We cannot agree. Even an admitted breach of contract—in and of itself—will not generally support an invocation of the unclean hands doctrine. *E.g.*, *Stewart Beach Condo.*, 481 S.W.3d at 351–52; *LDF Constr. v. Bryan*, 324 S.W.3d 137, 149–50 (Tex. App.—Waco 2010, no pet.). But here the jury found that Chow and Holloway did not breach the settlement agreement, and we have affirmed this verdict. Hence, McIntyre and Nehls cannot show they were seriously harmed by any ostensible scheme Chow and Holloway had not to comply with the parties' agreement.

On this record, we hold that the trial court could not rely on the doctrine of unclean hands to deny Chow and Holloway specific performance without abusing its discretion. The denial of specific performance on this basis would be arbitrary and unreasonable because the jury found that Chow and Holloway complied with

the settlement agreement, and it would be contrary to guiding rules or principles because McIntyre and Nehls cannot show serious harm absent noncompliance.

## 2. Tender of Performance

McIntyre and Nehls argue that because Chow and Holloway did not remove them from the BB&T loan at the same time Chow and Holloway tendered payment to buy out their interests, Chow and Holloway did not tender the performance required under the settlement agreement and therefore are disentitled to specific performance. But while a party who breaches a contract is not entitled to specific performance, the breach must be a material one to be disqualifying. *See, e.g.*, *Capcor at KirbyMain*, 509 S.W.3d at 390–91 (absent contrary contractual provision concerning specific performance, only material breach of contract precludes this equitable remedy).

Here, the jury heard testimony about the settlement agreement's loan-removal provision and the parties' conduct. The jury necessarily found that Chow and Holloway's failure to simultaneously tender payment and remove or release McIntyre and Nehls from the loan was immaterial, given that the jury instructions expressly placed the evaluation of materiality in the jury's hands. And, as we have already explained, the evidence is factually sufficient to support the jury's verdict.

Moreover, when one side clearly refuses to perform its part of the contract, parties seeking specific performance need not tender performance before suit.

44

*Luccia v. Ross*, 274 S.W.3d 140, 147 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Both McIntyre and Nehls asked Chow and Holloway to leave when they attempted to tender payment. McIntyre, the only one of the two who personally guaranteed the BB&T loan, testified he would not have accepted the tender of payment even if it was accompanied by a release from the loan. Given the unqualified refusal to accept Chow and Holloway's tender of performance under the settlement agreement, McIntyre and Nehls cannot resist specific performance by complaining about the purported inadequacy of Chow and Holloway's tender.

On this record, we hold that the trial court could not rely on the settlement agreement's loan-removal requirement to deny Chow and Holloway specific performance without abusing its discretion. The denial of specific performance on this basis would be arbitrary and unreasonable because the jury considered and found, given its responses to the relevant jury questions, that the loan-removal requirement was immaterial to the parties' compliance with the settlement agreement (at least insofar as McIntyre and Nehls contended that Chow and Holloway had to tender payment and removal from the loan at the same time), and it would be contrary to guiding rules or principles because only a material breach of the settlement agreement could bar specific performance. The denial of specific performance on this basis would also be arbitrary and unreasonable because McIntyre and Nehls categorically refused Chow and Holloway's buyout attempt,

and it would be contrary to guiding rules and principles because parties need not tender performance to obtain specific performance when the other side clearly refuses to perform its part of the contract without reference to the others' tender.

## C. Attorney's Fees

The final settlement agreement provides that "the prevailing party" in a suit for breach of the settlement agreement "will be entitled to reasonable attorneys' fees as part of its costs." An award of specific performance in a contract action can make parties prevailing parties, entitling them to an award of attorney's fees. *See, e.g.*, *Palavan v. McCulley*, 498 S.W.3d 134, 143 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (parties who obtained specific performance of settlement agreement were prevailing parties entitled to award of attorney's fees). Because they are entitled to specific performance, Chow and Holloway are entitled to their reasonable and necessary attorney's fees, which the trial court should determine in the first instance upon remand. *See Kroesche v. Wasser Logistics Holdings*, No. 01-20-00047-CV, 2023 WL 1112002, at *29 (Tex. App.—Houston [1st Dist.] Jan. 31, 2023, pet. denied) (mem. op.) (generally when trial court errs in refusing to award attorney's fees, correct remedy is remand for trial court to decide amount of fees).

## III. CONCLUSION

Accordingly, we affirm the take-nothing judgment as to McIntyre and Nehls, reverse the take-nothing judgment as to Chow and Holloway and render judgment

that they are entitled to specific performance of the settlement agreement, and remand this case to the trial court for the entry of a final judgment ordering specific performance in Chow's and Holloway's favor and awarding them attorney's fees as the prevailing parties.

Gordon Goodman
Justice

Panel consists of Justices Goodman, Landau, and Rivas-Molloy.